The next case on the docket is 524-1277, Taylor v. Japan Brake. We have another defendant in this case that has been dismissed, so the argument will only pertain to Japan Brake, as I understand it. Is that correct? Yes, Your Honor. This is Jonathan. Okay. And for the record, Mr. Reagan is appearing remotely. We have a hybrid situation going, so if at any time, Mr. Reagan, we can't hear you, or you can't hear us, please let us know, and we will certainly let you know, okay? Okay. Thank you, Justice. Excuse me. Maybe you would like to sit at the other table. Would you like to sit at the other table so you can see? I certainly don't mind. Okay. That would be, I think that would work out just great. That was a good suggestion. Thank you, Justice Hackett. Sure.  You might even put your chair at the end of the table so you can see. Yes, whatever is comfortable for you works for us. The Supreme Court gave us this technology, so we're going to use it. Okay. As I said, this is 524-1277, Melissa Taylor, Special Administrator for Don Taylor v. Japan Brake. The appellant is Mr. Reagan? Yes, Mr. Adler. You may proceed, sir. Thank you. May I please report, Mr. Stephan? My name is Michael Reagan, and together with my co-counsel, I represent the authority, Japan Brake Industrial Company Limited, in the first filed appeal in this case. As the Court has just noted, the other appeal by Octopono has been voluntarily dismissed. The plaintiff has filed a single brief in this case, but we're confident the Court will segregate this appeal from the facts and arguments directed at the dismissed appellee. They're different from Japan Brake's situation. There are two primary orders entered on the motions to dismiss for lack of personal jurisdiction. The first order, dated July 22, 2020, denied Octopono's motion and granted Japan Brake's motion. The Court found that Japan Brake did not purposefully direct or conduct any business activities in Illinois, and that there are simply no contacts with Illinois sufficient to demonstrate that the Court may exercise jurisdiction over this defendant. It is my understanding that that order was written in its entirety by Judge Stubbs. Japan Brake was kept in the case upon reconsideration for the purpose of participating in any jurisdictional discovery. The second order, dated November 12, 2024, denied the motions to dismiss of both Japan Brake and Octopono. Little was added to the record in those intervening four years, and we respectfully assert that there was nothing of jurisdictional significance as to Japan Brake. Mr. Rankin, the complaint was amended between that time and we're dealing with the Sixth Amendment amended complaint? It was, Your Honor. That's absolutely correct. Weren't there additional facts put into that complaint, which the Court used in its later order? There were, but they were merely allegations. And we have raised jurisdictional facts by affidavit, deposition, testimony, et cetera. And at that point, it becomes the obligation of plaintiffs to counter those facts, the relevant facts, with facts of its own as opposed to mere allegations. So that order, which was 45 pages long, was written in its entirety by plaintiffs' counsel without a single alteration made by the Court. This Court has already seen that even the word proposed remains in the caption of the order. I have not served the Court well today if I only attempted to repeat the twists and turns of the law of specific personal jurisdiction in this particular type of case. I believe that our briefs have properly described the lining forces of the law in both the Supreme Court of the United States and the Illinois Supreme Court. The seeming complexity arises from an ongoing discussion among justices of the Supreme Court of the United States as to the application of the law, mostly at its edges. The Illinois Supreme Court, in both Wiles in 1988 and Russell in 2013, stated that it would not adopt either the broad or narrow version of the stream-of-commerce theory without more definitive guidance from a majority of the United States Supreme Court. This Court did not make a choice among those theories either. Rather, the fundamentals of the law in this area make it clear that specific jurisdiction cannot be found here. I respectfully suggest that the decision in this case will be grounded in the fundamental simplicities of both the facts and the law. As to the facts, I realize that the Court is fully informed as to the facts, but I would like to point out just a very few key features of the facts as to Japan Brake. Japan Brake was a small company in Japan with a small plant. It manufactured friction material, which it sold to Japanese brake caliper manufacturers in Japan. The caliper manufacturers sold their product to a Japanese auto manufacturer. Japan Brake was just one of the multiple brake caliper brands which Mazda used. Only the caliper manufacturing determined where the calipers would be sold, and only Mazda determined where its automobiles would be sold. The record establishes that Japan Brake never knew any of that information. There is no deification of the record that any Japan Brake had ever reached the Tri-City Dealership, let alone that the city's father, Ray, had come in contact at any time with the Japan Brake product. Turning for a moment to the plaintiff's main argument, the plaintiff agreed, and colloquially with the trial court in argument, that it has proved something more than merely that the Japan Brake products were in Illinois. The plaintiff argues that there were two plus factors to support his main argument, that the narrow extreme economics theory has been satisfied. Neither of those factual contentions supports plaintiff. The edge codes are not specific to Illinois. They do not say anything about whether a brake is destined for Illinois, or the United States, or even anywhere else in the world. They only offer a possibility that it might be sold anywhere in the United States. None of the very few businesses of Japan Brake personnel to Illinois were linked to any effort to sell products in the relevant time period. The plaintiff's brief states in page six that Ray, Ray is the father, left his employment with Tricin in 1983. Plaintiff conceded that he is not contending for any exposure after 1984. Any of the visits of Japan Brake personnel to Illinois occurred after 1984, and there is no evidence nor argument to the contrary. And those visits, which are after the relevant period of exposure, were only for general market research and are categorically irrelevant because they took place after the claimed exposure. In short, there was no Japan Brake selling activity in Illinois at all, and certainly none before plaintiff's contended possible period of exposure. There are no presumptions operating in favor of plaintiff. The plaintiff has the burden of establishing personal jurisdiction once the issue has been properly raised. Japan Brake established in its main brief to this court that once relevant jurisdictional facts are issued, no presumptions operate, and the circuit court must decide the jurisdictional facts. Plaintiff did not respond to that argument, but merely restated his initial argument that certain presumptions were to be engaged in his favor. The type of presumption plaintiff says exists would be itself a denial of due process, and that is recognized in the academic text on the matter. But we didn't have to go into them because the plaintiff did not address the points we made that there isn't a presumption. So the fundamental of the law. This case is about due process. It's not about a generalized sense of what might be a convenient rule. The plurality opinion in Jay McIntyre and Shane brief from the Supreme Court of the United States sets out the agreement fundamentals of the law. Due process, and I'm quoting from the court briefly if the court would permit me. The plurality of due process protects the defendant's right not to be coerced except by lawful judicial power. Reaching back to Hanson versus Bentley in 1958, the opinion we're talking about, Jay McIntyre here, the opinion states the exercise of judicial power is not lawful unless the defendant purposely avails itself of the privilege of conducting activities within the foreign state, thus invoking the protections of the law. The court said there may be certain exceptions, such as intentional thwarts, but the general rule is applicable in this price liability case, and the so-called stream of commerce doctrine cannot displace it. The court said further, as a general rule, the sovereign's exercise of powers requires some act by which the defendant purposely avails itself of the privilege of conducting activities in the state. The defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the foreign. As a general rule, it's not enough that the defendant might have predicted that his goods will reach the foreign state. And here I think we're getting really at the area of the fundamental area of the law that I want to talk about. It takes us to the nature of the predictability or foreseeability which might be sufficient to support jurisdiction. In keeping what I'm trying to do here, there's a constant threat which runs through the Illinois and federal cases without any controversy. Our Supreme Court in Russell, and in reliance on its earlier opinion in Wiles, said that, quote, under either interpretation of the stream of commerce theory, it is clear that purposeful availment requires at a minimum that the alien defendant is aware the final product is being marketed in the foreign state. Quoting Justice Brennan's opinion in Ossetia. Now, you notice that I wasn't going to go through the twists and turns. I'm bringing up Justice Brennan because he was the advocate of the broad stream of commerce theory. Mr. Reagan, let me interrupt you. You said that they have to know that it's going to go to the targeted state. That's not exactly true, is it? It could be this state or any other state in the United States. It doesn't have to be Illinois, per se, if they're going to take advantage of the Illinois law. With respect, Your Honor, I must disagree. In what case are you relying on to disagree? The next sentence, there are some cases. I don't have those at the tip of my nose right now. But I can tell you that the next thing I want to rely upon from the Jamie McIntyre opinion is that the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the foreign state. Rather, it is that the defendant's conduct and connection with the foreign state are such that he should reasonably anticipate being hailed into court there. Well, that's a different rule, whether or not they perceive that they're going to be hailed into the foreign state. My question is on the stream of commerce theory. Isn't it true that if they place enough into the stream of commerce that it's likely that it will reach Illinois or any other state of the United States? The likelihood has to be the foreseeability, which I am focusing on, from the Brennan opinion, which was referenced in both Russell and Wiles, that it has to be in connection with the defendant's conduct and connection with the foreign state. And merely the idea that the product might be sold anywhere in the United States would not sufficiently satisfy due process. No, but my question was if it's going to be in the foreign state or any other state. So they put 50,000 pieces of component parts into the foreign state of Illinois during the period of exposure. That's what's alleged by the plaintiffs, correct? That's alleged, although it doesn't talk about it. It's not particularized to Japan-branded products, and it's not particularized in the complaint or the argument to even Illinois. I'm sorry. I'm sorry. Did Japan break file an affidavit to the contrary? We filed. We did not. We merely pointed out that those were allegations of the complaint and that our sales were only to the caliber manufacturer in Japan. But we did not file an affidavit as to that. But we did point out that the allegations are not, they simply do not, they're not narrow. They're not particularized as to Illinois. Did you file a motion attacking the sufficiency of the plaintiff's complaint in the Sixth Amendment amended complaint? We did not. We renewed our motion to dismiss for lack of personal jurisdiction. So you take the allegations in the plaintiff's complaint as true for the purpose of this proceeding? Only to the extent that they are not expressly negated on the relevant facts. I understand, but I asked you if you filed an affidavit. You told me no. That's correct. We did not. Mr. Sato, who became, who was the president, and we have his composition on file. But we do not have an affidavit directly at what the court is talking about, but the generalized fact of thousands of cars being sold in the United States market. And did your client know that these friction pads were going into brake systems for Mazda? I did not hear that question, Your Honor. My question was, did your client know that the friction pads that it was selling were going to go into brakes that would be placed into Mazda automobiles? Yes, we certainly knew that that was a possibility. So are you claiming that it was not foreseeable that Mazda automobiles would reach Illinois or any other state in the United States? Yes, I say that that is not foreseeable in this, within the meaning of the law, as it applies here. Is it possible? Certainly. Well, how is this case different from the Gray case, which is a component part case? Which case? Which case?  Both. I'm sorry. The Watermeeter case. Yes. The Watermeeter case. Yes. So Gray is the... Gray, the plaintiff has said that this court can't overrule Gray, and we did not ask it to be overruled. We've never even intimated to that at all. But Gray was a long time ago, and there has been an accretion of law, both in the Supreme Court in the United States and in Illinois, which has built up around Gray. And I think it's very interesting that all the cases, they pay recognition to Gray, as you have, Justice Cates, right now. But they also then go on to describe everything that's happened since then, and most notably, in Russell, which is the, you know, obviously the Illinois Supreme Court case, Gray was mentioned only in footnote two, and it says that, you know, Gray was the first case in the United States which talked about the stream of commerce theory. They didn't discuss Gray in the opinion itself, but rather talked about the things that I'm talking about here, and going back to the question you've been asking me about foreseeability, it's not foreseeability in the generalized sense, but rather what I'm, what is repeated in Miles, what is repeated in Russell, and both in Justice Brennan, even when he's talking about the broad theory of stream of commerce, says that the foreseeability that is critical is not the mere likelihood that a product will find its way into the foreign state, and he gets that. He said, rather, it is that the defendant's conduct in connection with the foreign are such that he should reasonably insist that they be hailed into court there. Well, you keep combining the two concepts of being hailed into court versus the contacts with the state. Those are not the same concepts, are they? I think they are, because when going back to the fundamental here, due process has to be satisfied, and due process starts off with the assumption that a state cannot coerce, cannot take action with respect to a party unless the defendant is acting in such a way that it is reasonably foreseeable within the meaning of foreseeability in this area that it could be hailed into court so that it can take actions to protect itself, to decide not to be here, and that sort of thing, and none of that's supportable under the facts here. The court's been gentle. In Russell, the Supreme Court found there was jurisdiction, right? Yes, that's right. And it acknowledged Gray, as you say, in a footnote. Yes. But the Supreme Court indicated that the burden imposed on the defendant by requiring it to litigate in a foreign forum is just one of the factors that should be considered, correct? The other factors are the state's interest in resolving the dispute, the plaintiff's interest in obtaining relief, the interests of the other's affected forums in the efficient judicial resolution of the dispute, and advancement of substantive social policies. All of those are part of the due process analysis in Russell. Good. They are. They also get into primarily the reasonable misconduct. And the plaintiff here has recourse. That is one of the things that I think perhaps is on your mind, although I don't pretend to know. It would be a privilege to know that. The plaintiff has sued three other defendants here, including Mazda, and most of those defendants, they certainly must have not raised a jurisdictional issue. I'd like to get one more sentence, if I could, about Gray here. The courts work with and around Gray. And so, for instance, in Wiles, the Supreme Court case, that involved a Japanese manufacturer, and the court distinguished Gray by saying that in Gray, it was a fair inference that the manufacturer, and I'm quoting, of a commercial product in a state border in Illinois had purposely availed itself of the Illinois market. And the court did not think that was a fair inference with respect to a Japanese manufacturer, just like us, which is more than, and I checked last night, 6,495 miles away, as opposed to being a joint state. We have two other elements. I don't intend to go into them. If I could, there were not. I'm not going to argue about, and that is the two other elements of specific jurisdiction, that there has to be a causal connection or a rising out of, and there is no showing here, no product identification of a Japan-Gray. And that's different. Well, before you get into product identification, are you raising product identification now as it relates to specific jurisdiction? I am, only because everything we've talked about so far relates to purposeful availment to give rise to minimum context. If that is the issue, is purposeful availment, it gives rise to minimum context. And in Wiles, only nine machines have been sold nationwide, and I think four machines have been sold in the United States. Only four in the whole United States have been sold. So the minimum context in Wiles was not really met there, correct? The court did not focus on that. Rather, it focused on the actions of the defendant, which is what we're trying to do here. In our reply brief, we addressed what you had just raised in great length, which is the difference between a quantitative analysis and a qualitative analysis. And the courts and the Illinois courts use those terms, and we've documented it in our brief, that the court cannot engage in a quantitative analysis, but rather must look at the quality of the defendant's conduct, which is what takes us back to the nature of due process. Has the defendant acted in such a way on a qualitative basis to justify the imposition of the state's power over the defendant? The court's been generous with its time, and my time is more than enough, and I thank the court. Mr. Reagan, you'll have some opportunity to make comments after Mr. Steffen. Let me ask Justice Hackett if he has any questions. No, thank you. Justice Moore? Okay. Mr. Steffen? Thank you, Your Honor.  Honorable Justices, Counsel, may it please the Court. I'm John Steffen, here representing lifelong Illinois resident Melissa Taylor, who has brought a products liability claim against Japan Brake Industrial Co., Ltd., which is alleged to have poisoned her husband, Don. Like Melissa, Don was Illinois through and through. He was born here, raised here. He developed asbestos-related cancer here, and importantly for this case, he was exposed to Japan Brake's asbestos here in Illinois. Mrs. Taylor? Was Japan Brake raised as part of its specific jurisdiction objection, the fact that you've not identified it as a product that was involved in the exposure? So, Your Honor, Japan Brake has mentioned PID as a reason to undercut the pretty clear connection between Japan Brake and Mazda, and then Mazda and then Ray Taylor, and then, of course, Ray Taylor to Don Taylor. The record is replete with vehicle specification forms called NVMA forms. They started, I think, at about page 4,000. It's actually Akebono provided the clerk's papers here. But there are many specification forms that show that Japan Brake's brakes were mostly the front pads on Mazda cars during certain years in certain models. As I told the trial court below, we can already get past summary judgment on this case on PID issues. So not only do we have— PID is a record meaning product identification. Yes, Your Honor. And moreover, we have both documents from Japan Brake and the sworn testimony of its former president about which models and which years contain Japan Brake's brakes, and those are Mazda's and Honda's during the exposure time here. So in terms of product identification, one, I think that's putting the cart before the horse. But in any event, we went on it. So— Okay, so the record contains the information that presumptively applies to the plaintiff. Yes, it's circumstantial evidence, Your Honor. No mechanic, no parts person is going to understand that when he grabs a box of Mazda brakes that the lining on those brakes were actually made by Japan Brake. That's just not something that mechanics care about or parts guys care about, parts people. Regardless, I wanted to start with answering your question, Justice Cates, before I get off into Asahi and further along. Your question was, does it have to be Illinois per se? In other words, does the indirect service or targeting of a market have to target a specific state? And the answer to that question is, of course, no, which is why you didn't get an answer from my colleague. And I'm just going to quote from Ford, which I do in the brief, but I've said it to every court I've ever had this argument in front of, so I'm going to say it again. If the sale or product of a manufacturer or distributor is not simply an isolated occurrence but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the markets for its products in several or all other states, it is not unreasonable to subject it to suit there. In one of those states, if it's allegedly defective product, merchandise, has there been a source of injury to its owner or to others, period. And that's the Ford case at page 363. That is the case, Your Honor. And I want to talk a little bit about the Russell case because I think it's even more on point than the Ford case. But in terms of what the unanimous Supreme Court of the United States now understands to be the scope of stream of commerce jurisdiction, that's it. That quote from Ford quotes directly to Worldwide Volkswagen, which is a 1980 case. And, of course, Worldwide Volkswagen quotes directly to the Supreme Court of Illinois' Gray case. So, in other words, there's a straight-through line from 1961 in Illinois all the way to Ford a couple years ago. That answers your question, Justice Cates. And the question is, the question being, does the targeting have to be Illinois-specific or can it be just a group of states or all the states? So I like to think of the hypothetical. Let's say I have a Popsicle salesman who lives next to my house. And he loves getting the Popsicle contract for all the major league stadiums this year. I live in St. Louis, so I'll take that as an assumption in my hypothetical. But he only sells the Popsicles to major league headquarters in New York City. He only ships his Popsicles to New York. He doesn't have a jurisdictional defense to defend against a lawsuit in Seattle if a Mariners fan gets punctured by a sharp Popsicle stick or in Arlington, Texas if a Rangers fan gets punctured or in Wrigley Field if an Illinois resident gets hurt by that product. Just because a seller of merchandise knows that its product is going to go all around the United States doesn't mean at all that it's jurisdictionally bound or constitutionally forbidden, I guess is a better way to think of it, from being hailed into court there. A couple of the points I wanted to discuss in response to counsel's argument before I plod into my own. Of course, Japan Brake doesn't ask this court to overrule Gray. It can't. And so what it does, it just ignores Gray completely. But I think more important than Gray is the Russell case. And while my colleague pays lip service to Russell, Japan Brake doesn't spend any time grappling with the facts of the Russell case, which is, of course, a component part manufacturer case on helicopters where the number of helicopters in Illinois sold into Illinois is dwarfed by the number of Mazdas and Hondas that came into Illinois over the last 50 years. The number of component parts that came into Illinois from Japan Brake is dwarfed the number of component parts that came into Illinois from the French manufacturer of ball bearings via Italian helicopters in the Russell case. Russell is on all fours with this case, other than, I would argue, that the facts that the minimum contacts that plaintiff has established here far, far outweigh the minimum contacts that the Supreme Court grappled with in Russell. In fact, Japan Brake's argument is somewhat familiar. And it's familiar because I'm sure Your Honors have read the dissent in Russell. One justice dissented in the Russell case. And largely along the lines that are advanced here by Japan Brake, simply that a component part manufacturer doesn't have any sort of control over where its products go. Well, control is not the test, and that's what we learned from Russell, and that's what we learned from the other stream-of-commerce cases. If I were a corporate defendant trying to get out of a stream-of-commerce case, I would also cite to the plurality opinion in McIntyre, like Japan Brake has done. It makes it the centerpiece of its argument. It can't do that, though. It's not the centerpiece of stream-of-commerce jurisdiction. What McIntyre does is underscores the Supreme Court's old rule that the single isolated sale of a product that kind of meanders its way through the stream-of-commerce and injures a foreign resident is not enough to establish minimum contacts under the jurisdictional test. However, I think the most important, actually I think the most important concurrence that we have on this issue is actually Justice Stevens' concurrence from Asahi, where he disagrees that Justice O'Connor even need to talk about minimum contacts at all. But then adds on, effectively that Justice O'Connor kind of applied the wrong test in terms of the stream-of-commerce test. So what Justice Stevens there says is that the volume and the value and the number of products that make their way into a state also has to be part of the calculus. So in that sense, and of course Justice O'Connor's test itself is not an exhaustive test, but in that sense all of the tests, all of the combinations and configurations of justices both in Illinois and the United States Supreme Court who have weighed in on this issue have come down inside of this, where a foreign resident is injured by a mass-produced product that makes its way indirectly into a foreign state, personal jurisdiction will lie. In other words, the Fourteenth Amendment to the United States Constitution does not forbid a court from exercising jurisdiction. Again, that was a pretty direct question. Does Japan break the dispute that thousands upon thousands upon thousands of its brakes made their way into Illinois on Mazdas, on Hondas, in Mazda boxes during the exposure period of this case? And indeed, as the record shows, still to this day. I brought them for good luck. But I've put out, just for the record, I've put on the podium some Japan brake brakes that were bought. A picture of these is part of the record that these were bought in Wood River, Illinois sometime before the briefing was closed in this case. I want to point out another couple of facts from the deposition of Mr. Sato that I think have been overlooked by my colleague. My colleague was very insistent upon repeating... Well, can I ask you a question? Please. You put on the podium a box. You said it was a brake. Could you open it and show us? Sure, Your Honor. So this is the new brake pads. There's two types of brake applications. So pads comprise... Calipers will squeeze the pads to the friction material to a metal disc in the middle. So you end up with this image or this mechanical function that squeezes these together. Counsel, I'm not sure if you can see me. Thank you. And so on the back of these pads, not on the friction material but on the metal parts, are the letters JB, HP70HFG. Now the FG tells us what the friction coefficient is on the friction material itself. That's just what the safety and what the... Well, now I guess it's AMICA, not the AAMVA, provides. But this is a Japan brake. Japan brake made the friction material on these brakes. They were bought on Wood River for the last couple of years. And again, Japan brake doesn't really deny any of these allegations or these jurisdictional facts. I think even more importantly, in Mr. Sato's deposition, a couple of other facts came out. One is that Japan brake worked with the caliper manufacturer and its OE customers, so in other words Mazda and Honda, to develop the products that would end up, of course, on Mazda's cars and for Mazda replacement parts, and therefore in Illinois along with the other 49 states. And that's cited, too, in the record, but it's... I know it's cited in the record. Sorry, I don't have it right on the top. I'm saving my time. More importantly, Mr. Sato, who is the president of Japan brakes, admits that the market for its products, the market for Japan brakes products, was, quote, where the vehicles on which our products were equipped were sold, end quote. And that is a supplemental record 1593. And again, combined with Russell, combined with that quote, that's it. That's the case. There's no allegation, much less form proof, on the part of Japan brake that the existence of its brakes in Illinois was random or isolated or fortuitous. Or the act of some unrelated third party. That's another thing that Russell tells us, is that just because a manufacturer gives its component part to a different manufacturer, that does not create the unrelated act of a third party, like in, for example, Walden versus Fiore or the Nicastro case, that got a manufacturer out of personal jurisdiction in the forum state. In other words, in the state of where the accident happened. I think another question that I think is also worth asking is, did Japan brake take any steps to keep its brakes out of Illinois? And I think the answer to that is no. And that's also another thing that comes up over and again, most recently in the Ford case. But a company can take steps to keep its products out of the market. Japan brake has not counterledged nor provided any evidence that it's done so. Instead, what Japan brake has done is effectively take the ostrich approach. We made these brakes. We gave them to Mazda. We don't know what Mazda did with them. Well, that would be the same thing as my neighbor, the popsicle salesperson, pretending to be oblivious to where his popsicles were going to end up. Except more so because Japan brake is obviously bigger than a popsicle salesman. It's a large, sophisticated manufacturer of component parts. There's this idea of recourse. Could you ask Mr. Sato, if Japan brake sells brake parts in the box that can be purchased separately, how do they not know that they're coming to the United States or Illinois? So Mr. Sato, Sato-san, had personal knowledge of a lot of the mechanisms by which Japan brake got its brakes to the United States by the time he was president. In the 1980s, in the exposure period in this case, he wasn't really that high up in the company. He wasn't really working on packaging. So in other words, I've never proposed to anybody with personal knowledge or who had access to somebody with personal knowledge of the kind of packaging system. Were the brakes sold in the United States as original equipment that you could buy separately? Your Honor, that's what we've alleged, and there's no counterfeits that point the other direction. And of course, also that makes sense. That's the way OE, and just for the record, that's original equipment. That's the way original equipment products work. If you go to the Nissan dealership for Nissan brakes, you get them in a Nissan box. If you go to a Mazda dealership in Wood River and get Mazda brakes, they come in a Mazda box. Now who put them there? Who put them in the box? The fact is you can actually buy the Mazda brake. Correct. The brake system that was original equipment on the car when purchased. That's right. So when a mechanic or an end user replaces brakes, normally what they're replacing are the friction material and the pad, I guess we would say. So the metal part and the friction material part. You're not necessarily replacing the entire brake system. That would be much more expensive. In fact, the whole point of the brake friction material is that it gradually wears away and so that you can replace just that part so you don't have to replace the metal disc that spins, for example. But the friction material is what was manufactured by Japan Brake. That's right. Okay. So, Your Honor, I see I've got a red light here and I'm unfortunately out of time. Questions? No more questions. Questions? No, thank you. Okay. Mr. Sutton, thank you for your arguments here. Thank you, Your Honors. Mr. Reagan. Mr. Reagan? Mr. Reagan, I don't want to get into all these. Excuse me, Mr. Reagan. Justice Moore has a question. I just want to make sure you were able to hear everything and that you could see the box that was being displayed. Could you say that again, please? I just wanted to make sure that you could hear everything and see the box that was shown. I had trouble hearing and I appreciate your court's inquiry, but that's my problem. I think I was able to get the gist of things. I'm familiar with evidences of one box in the case. Whether it was that box or not, I don't know. But thank you for your court's inquiry. And I'll address that if I could on the question of OEM parts. There's only one piece of evidence in the case about the purchase of an OEM brake. And that was an affidavit from the Lance Investigator in 2024, making a purchase of, you know, a part. There is no evidence as to how those parts came to Illinois. And there's no evidence as to how they were sold, if they were sold, during the relevant period of exposure. So that's the only thing in the record about OEM parts. There are many ones that are on OEMs, too. Okay. What does OEM stand for? What does OEM stand for? Original Equipment Manufacturer, I believe. That's my understanding. Yes, my understanding is it means an original part. Pardon me? An original part. It means an original part. Yes, something made by somebody who originally made the parts for the vehicle. Yes, that's correct. Just in case you asked earlier about the emphasis of the sales to the U.S. general, page 30 of our main brief, we cite the federal trial court opinion, admittedly, but it had no trouble dealing with the issue. And the court said, put another way, there's a difference between a corporation's targeting of a foreign state and its indifference as to where the distributor ultimately sends it. And that's Pyle Unlimited versus Blank, B-L-A-N-K-E, 47 Bedsop Third, Northern District of Illinois, at 750. Mr. Reagan, I think the Illinois Supreme Court carries better precedent than that. It does, but I'm not aware, and I was quick to tell the court that it was a trial court opinion, obviously. But the Illinois Supreme Court does not have authority for the proposition that sales into the U.S. generally are sufficient to satisfy due process concerns of a state. So, true, if there were a U.S. and Illinois Supreme Court case on point, then obviously we would know about it and be discussing it. Mr. Stepin relies upon Russell. Russell's very different in this case. Russell, the manufacturer of Bering and Russell, had Illinois customers. It dealt with Illinois, other Illinois companies. And a company with which it had an affiliation was held to be a distributor within Illinois. And none of those facts are present here. We talked about the quantitative versus qualitative distinction. At our reply brief in pages five and six, we cite the United States Supreme Court in a chapter versus Heidner, which says that it must be a qualitative analysis rather than a quantitative analysis. And Justice Moore wrote an opinion for the court in a medical case, Allen, in 2022, in which he said that the court must look at the quality and the nature. By he, I realize that opinions are written for the court, not a particular justice. But the court said it must look at the quality and nature of what's going on. So this concept which we had written about at great length is that merely pointing to a large number of sales is not sufficient. You have to look at the quality. And for due process purposes, we have to go back and look at the defendant's actions in terms of whether it indicates that it was intending to invoke the protection of the courts of the state. So I thank the court for its obvious preparation and attention. Mr. Raymond, what do you have to say about the fact that Japan Brake directly sells product to car dealers so that you can go in and buy original equipment parts? That this record does not contain sufficient facts for which this court can ground its decision upon that allegation. There's the purchase of one part in 2024, and that is the only evidence, and there is no evidence at all as to how that part got to Illinois. So is there an allegation in the sixth amended complaint that OEM parts were sold by Japan Brake during the relevant time period? The complaint is long, and I can't answer the first question. Okay. But I would go back to, again, I'm repeating myself, that those parts could come to Illinois in many ways. They would come, and most likely do come, from Honolulu directly rather than from Japan Brake, and there's no evidence to the contrary. What about the efforts made by Japan Brake to comply with rules and laws of the state of the United States, such as edge codes? What about the affirmative acts taken by Japan Brake to do that? They were asked to do that by Mazda, and those edge codes are... I'm trying to address the court's question. The edge codes are not specific to Illinois in any way, shape, or form. Agreed. Okay. So they say nothing about the state of Illinois. My question is, what about the efforts made to comply with United States rules and laws? Again, it is compliance with a requirement for sale of the United States. I can see that, but it says nothing about sale of Illinois. So is it your position that there must be a targeting of Illinois in order for there to be specific jurisdiction? Yes. Okay. Questions?  No, thank you. Okay. All right, your time has expired, Mr. Reagan, and the justices have no further questions. Thank you for your arguments here today. This matter will be taken under advisement. It's an interesting issue. We'll issue an order in due course. Thank you.